MARTIN LIPSCOMB, Employee, Plaintiff v. MAYFLOWER VEHICLE SYSTEMS,
Employer, and AIG CLAIM SERVICES, INC., Carrier, Defendants

No. COA10-1415

(Filed 19 July 2011)

### 1. Appeal and Error— appealability—writ of certiorari— appellate rules violations

In the interests of justice and under N.C. R. App. P. 2 and 21, the Court of Appeals elected to treat the record on appeal and briefs in a workers' compensation case as a petition for writ of *certiorari*. Although defendants failed to articulate grounds for appellate review as required by N.C. R. App. P. 28(b), the error was nonjurisdictional, and thus, did not require dismissal.

### 2. Workers' Compensation— temporary partial disability— amount of payments

The Industrial Commission erred in a workers' compensation case by concluding that plaintiff was entitled to temporary partial disability benefits in the amount of $330 per month. The case was remanded for a determination of the weekly amount of plaintiff's payments.

### 3. Workers' Compensation— authorized treating physician— treatment appropriate and reasonably necessary

The Industrial Commission did not abuse its discretion in a workers' compensation case by ordering defendants to provide medical compensation for plaintiff's treatment by his requested doctor. The treatment was appropriate and reasonably necessary to provide pain relief and improve plaintiff's function.

Appeal by defendants from order entered 16 April 2010 by the North Carolina Industrial Commission. Heard in the Court of Appeals 26 May 2011.

*Ferguson, Stein, Chambers, Gresham & Sumter, by Geraldine Sumter and Lareena J. Phillips, for plaintiff-appellee.*

*McAngus, Goudelock & Courie, P.L.L.C., by Jason C. McConnell and Viral V. Mehta, for defendant-appellants.*

CALABRIA, Judge.

Mayflower Vehicle Systems ("employer") and AIG Claim Services, Inc. ("carrier") (collectively, "defendants") appeal the North Carolina Industrial Commission's ("the Commission" or "the Full Commission") Opinion and Award denying defendants' motion for reconsideration. We reverse in part, vacate and remand in part, and affirm in part.

## I. BACKGROUND

On 7 December 2004, plaintiff was working for employer as a "floater." Plaintiff's primary employment duties included working on different projects throughout employer's plant, including assembling New York City garbage trucks along with other large trucks and cabins. Plaintiff's additional job duties included bulk framing, part assembly, placing roofing on trucks, welding, Ecoat loading, options and drilling, and sealing cracks in cabs. Plaintiff's job as a "floater" was a "heavy duty job" because he was required to regularly lift up to 75 pounds.

At 3:30 p.m. that day, plaintiff's team leader asked him to move an LE cab to the next process. Plaintiff left a tow motor to adjust the wheels on the truck skid. After plaintiff adjusted the front wheels, he walked around the equipment in order to adjust the rear wheels. While plaintiff was walking, he slipped on an oil spill, fell on the concrete floor, and landed on his back. Plaintiff then notified his supervisor of the fall. As a result of the fall, plaintiff sustained a specific traumatic injury to his back and left knee.

On 8 December 2004, Dr. Timothy Sloand ("Dr. Sloand") diagnosed plaintiff's injuries as an acute lumbar sprain and left knee contusion, prescribed pain medication, and advised plaintiff to rest during the weekend. On 13 December 2004, Dr. Sloand released plaintiff to return to full duty work. Less than two weeks later, plaintiff returned to Dr. Sloand for treatment of back pain. On 17 January 2005, Dr. Sloand performed a lumbar MRI on plaintiff, which revealed a right para-median broad-based disc protrusion. On 26 January 2005, Dr. Sloand released plaintiff from care for his knee contusion and referred him to a neurosurgeon for further evaluation of his lumbar condition.

On 16 February 2005, defendants filed a Form 60 with the Commission, admitting plaintiff had a right to compensation for his injury. Defendants further admitted that, at the time of the injury, plaintiff's average weekly wage was $851.03, and agreed to pay plaintiff temporary total compensation in the amount of $567.38 beginning 8 February 2005 and ending 2 September 2005.

On 18 February 2005, plaintiff was referred for additional back treatment to Dr. William Hunter ("Dr. Hunter"), who diagnosed plaintiff with a herniated right disc at the L-5/S-1 region. Dr. Hunter prescribed physical therapy for plaintiff for the period from 28 February through 13 April 2005. Defendants subsequently approved medical treatment by Dr. Hunter as plaintiff's authorized treating physician.

On 15 April 2005, plaintiff returned to Dr. Hunter for back pain. Dr. Hunter referred plaintiff to Dr. R. Scott Rash ("Dr. Rash") for chiropractic treatment, and excused plaintiff from work for four weeks. Plaintiff sought treatment from Dr. Rash for the period from 31 May through 15 July 2005, without relief.

Plaintiff returned to Dr. Hunter on 31 August 2005 for pain in his lower back, hip, buttocks, and right leg. Dr. Hunter recommended that plaintiff choose either oral medication or therapeutic injections. Plaintiff chose medication, and Dr. Hunter prescribed Sterapred for 12 days and told plaintiff that he should undergo an epidural steroid injection in the L-5/S-1 region if his condition did not improve. Dr. Hunter also assigned plaintiff light duty work restrictions of no lifting greater than 30 pounds.

On 2 September 2005, Dr. Hunter noted that plaintiff's condition had stabilized and that plaintiff had reached maximum medical improvement ("MMI"). Dr. Hunter assigned a 5 percent (5%) permanent partial impairment rating to plaintiff's back. Also on that day, plaintiff began a "trial return to work" as a light duty assembler under Dr. Hunter's orders. Plaintiff was to work four hours per day, progressing to full time, and was restricted to no lifting greater than 30 pounds. However, plaintiff continued to experience pain, even after employer placed him in a lighter duty position involving cab preparation. On 3 October 2005, Dr. Hunter released plaintiff to return to full duty work.

At Dr. Hunter's recommendation, plaintiff received epidural steroid injections from Dr. Richard Park ("Dr. Park") on 7 and 31 October 2005. However, the injections provided minimal relief. On 9 November 2005, plaintiff returned to Dr. Hunter, who ordered plaintiff to undergo a CT myelogram ("the exam"). Plaintiff underwent the exam on 18 November 2005, and it revealed an abnormality at the L-5/S-1 region centrally located paracentral to the right side. Dr. Hunter indicated that the exam also revealed a very mild bulge at L-3/4.

Plaintiff sought a second opinion from Dr. James Hoski ("Dr. Hoski") on 24 January 2006. Dr. Hoski reviewed the CT myelogram

and noted that it showed plaintiff had degenerative disc disease at L1-2 and right central disc protrusion at L-5/S-1. After performing a comprehensive examination of plaintiff, Dr. Hoski noted that plaintiff was a candidate for right L-5/S-1 micro lumbar discectomy. Dr. Hoski further noted that the goals of this surgery were to reduce plaintiff's leg pain and increase his level of function. Dr. Hoski then excused plaintiff from work until further notice.

On 28 February 2006, plaintiff returned to Dr. Hunter and told him the results of Dr. Hoski's second opinion. Dr. Hunter indicated that he would "leave it up to the second opinion physician to care for [plaintiff]." On 8 March 2006, plaintiff filed a motion with the Commission to approve Dr. Hoski as his authorized treating physician. Special Deputy Commissioner Elizabeth M. Maddox denied plaintiff's request on 19 July 2006.

Plaintiff returned to Dr. Hoski and indicated he wished to proceed with surgery. On 29 March 2006, plaintiff filed a request for medical leave with employer and asked for leave beginning 29 March 2006 until ten weeks after surgery. Plaintiff underwent surgery on 30 March 2006, and Dr. Hoski excused plaintiff from work for ten weeks. However, defendants did not authorize the surgery and denied payment for it.

Dr. Hoski referred plaintiff to physical therapy for the period of 23 May through 30 August 2006. On 30 May 2006, Dr. Hoski continued plaintiff's out-of-work status until 28 July 2006. On 28 July 2006, Dr. Hoski instructed plaintiff to remain out of work for an additional six weeks due to continuing mid-back pain.

Although plaintiff continued to experience lower back pain, the surgery decreased his leg pain. Plaintiff returned to Dr. Hoski for a follow-up visit on 15 September 2006. Dr. Hoski determined that plaintiff reached MMI and assigned a 10 percent (10%) permanent partial impairment rating to his back. Dr. Hoski also released plaintiff to return to medium duty work, with lifting restrictions of 10 pounds constantly, twenty-five pounds frequently, and up to 50 pounds occasionally.

Due to plaintiff's treatment by Dr. Hoski, he was unable to earn any wages in any employment from 24 January 2006, the date Dr. Hoski removed him from work, until 2 September 2006, when Dr. Hoski released him to return to work. Following the surgery, employer did not offer plaintiff any positions within his work restrictions or attempt to provide him with vocational rehabilitation.

Plaintiff did not return to work with employer, and employer did not provide him with suitable employment that met the "medium demand level" restrictions.

In October 2005, plaintiff established a business named Lipscomb's Used Cars. In his duties as the sole salesperson, plaintiff traveled to auctions, purchased cars, and resold them. He also assisted customers by financing the purchase of the cars he sold. On 5 November 2007, plaintiff filed a Form 90 with the Commission, indicating that he earned a total of $11,740.72 working at Lipscomb's Used Cars since 10 October 2005.

In February 2008, defendants employed John McGregor ("McGregor"), a vocational rehabilitation specialist, to assist plaintiff in finding suitable employment within his medium duty work restrictions. According to McGregor, plaintiff was "nice and very friendly," had "a good personality . . . was willing to work hard," and possessed the "skills, personality, and enthusiasm necessary for working as a car salesperson." McGregor also stated that plaintiff would be "highly employable" at a new or used car lot. Furthermore, McGregor stated that, since plaintiff did not earn much money from his own car dealership, that he should consider working for another car dealer. However, plaintiff "refused to consider working for anyone else, stating that he preferred instead to work for himself."

Defendants requested that plaintiff's claim for additional compensation and payment for Dr. Hoski's treatment be assigned for a hearing. On 26 May 2009, Deputy Commissioner Kim Ledford ("the Deputy Commissioner") filed an Opinion and Award, concluding that Dr. Hoski's medical treatment was appropriate and reasonably necessary to provide pain relief and improve plaintiff's function, and granting plaintiff's request to approve Dr. Hoski as his authorized treating physician. The Deputy Commissioner also ordered defendants to pay plaintiff's medical expenses incurred as a result of his 7 December 2004 injury, including treatment rendered by Dr. Hoski. Furthermore, the Deputy Commissioner ordered defendants to pay plaintiff $330.00 per week in compensation for "permanent partial impairment" beginning 3 September 2006. Defendants appealed to the Full Commission.

On 5 January 2010, the Commission filed an Opinion and Award ("the 5 January 2010 Opinion and Award"), reaching the same conclusions as the Deputy Commissioner and also ordering defendants to pay Dr. Hoski for plaintiff's treatment, and to pay plaintiff $330.00 per week in compensation for "permanent partial impairment" for the

period beginning 3 September 2006. Defendants thereafter filed a Motion for Reconsideration of Award, arguing that the Full Commission "incorrectly calculated the amount of temporary partial disability owed" to plaintiff. The Full Commission denied defendants' motion on 16 April 2010 ("the 16 April 2010 Order"). On 27 August 2010, defendants filed a Notice of Appeal, which stated that defendants "appeal[] the Full Commission's Order Denying Defendants' Motion for Reconsideration of the Opinion and Award for the Full Commission . . . filed on April 16, 2010[.]"

## II. STANDARD OF REVIEW

A party may appeal an Opinion and Award of the Full Commission "to the Court of Appeals for errors of law under the same terms and conditions as govern appeals from the superior court to the Court of Appeals in ordinary civil actions." N.C. Gen. Stat. § 97-86 (2010).

> Under the Workers' Compensation Act, "[t]he Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Anderson v. Lincoln Constr. Co.*, 265 N.C. 431, 433-34, 144 S.E.2d 272, 274 (1965). Therefore, on appeal from an award of the Industrial Commission, review is limited to consideration of whether competent evidence supports the Commission's findings of fact and whether the findings support the Commission's conclusions of law. *Adams v. AVX Corp.*, 349 N.C. 676, 681-82, 509 S.E.2d 411, 414 (1998). This "court's duty goes no further than to determine whether the record contains any evidence tending to support the finding." *Anderson*, 265 N.C. at 434, 144 S.E.2d at 274.

*Richardson v. Maxim Healthcare/Allegis Grp.*, 362 N.C. 657, 660, 669 S.E.2d 582, 584 (2008). "The facts found by the Commission are conclusive upon appeal to this Court when they are supported by competent evidence, even when there is evidence to support contrary findings." *Pittman v. International Paper Co.*, 132 N.C. App. 151, 156, 510 S.E.2d 705, 709 (1999).

## III. INITIAL MATTERS

[1] As an initial matter, defendants' notice of appeal states that the order they are appealing is "the Full Commission's Order Denying Defendants' Motion for Reconsideration of the Opinion and Award for the Full Commission . . . filed on April 16, 2010[.]" An examination of the record reveals that defendants originally filed a notice of

appeal of the 5 January 2010 Opinion and Award on 2 February 2010. On 12 April 2010, the Commission filed an order granting defendants' request to withdraw their notice of appeal of the 5 January 2010 Opinion and Award. Defendants did not file a notice of appeal for the 5 January 2010 Opinion and Award. Therefore, defendants' purported appeal of the 5 January 2010 Opinion and Award is not properly before us.

North Carolina Rule of Appellate Procedure 21 states, in pertinent part, that a "writ of certiorari may be issued in appropriate circumstances by either appellate court to permit review of the judgments and orders of trial tribunals when the right to prosecute an appeal has been lost by failure to take timely action[.]" N.C. R. App. P. 21(a)(1) (2010). According to N.C. R. App. P. 21:

> (b) . . . Application for the writ of certiorari shall be made by filing a petition therefor with the clerk of the court of the appellate division to which appeal of right might lie from a final judgment . . . .

> (c) . . . The petition shall be filed without unreasonable delay and shall be accompanied by proof of service upon all other parties. . . . The petition shall contain a statement of the facts necessary to an understanding of the issues presented by the application; a statement of the reasons why the writ should issue; and certified copies of the judgment, order, or opinion or parts of the record which may be essential to an understanding of the matters set forth in the petition.

N.C. R. App. P. 21(b), (c). Defendants have "not complied with the procedural provisions of N.C. App. P. 21, [] and ha[ve] not offered any explanation for [their] failure to do so." *Harbour Point Homeowners v. DJF Enterprises*, —— N.C. App. ——, ——, 697 S.E.2d 439, 448 (2010) (internal citation omitted).

North Carolina Rule of Appellate Procedure 2 ("Rule 2") provides, in pertinent part:

> To prevent manifest injustice to a party, or to expedite decision in the public interest, either court of the appellate division may . . . suspend or vary the requirements or provisions of any of these rules in a case pending before it upon application of a party or uponits *own* initiative[.]

N.C. R. App. P. 2 (2010). However, "Rule 2 must be applied cautiously . . . [and] 'relates to the residual power of our appellate courts to con-

sider, in exceptional circumstances, significant issues of importance in the public interest or to prevent injustice which appears manifest to the Court and only in such instances.'" *State v. Hart*, 361 N.C. 309, 315-16, 644 S.E.2d 201, 205 (2007) (quoting *Steingress v. Steingress*, 350 N.C. 64, 66, 511 S.E.2d 298, 299-300 (1999)).

Our Court has the authority, in the exercise of our discretion, to treat the record on appeal and briefs as a petition for writ of *certiorari* pursuant to N.C. R. App. P. 21, to grant the petition, and to review defendants' challenge to the Commission's 5 January 2010 Opinion and Award on the merits. *Harbour Point Homeowners*, —— N.C. App. at ——, 697 S.E.2d at 448.

Upon examination of the record in the instant case, including the 5 January 2010 Opinion and Award, defendants' Motion for Reconsideration with their attached proposed order, and plaintiff's response to defendants' motion, along with the parties' arguments in their briefs, we conclude that the issues involved in the appeal of the 16 April 2010 Order are inextricably intertwined with the 5 January 2010 Opinion and Award. Furthermore, our examination of the Commission's 5 January 2010 order reveals that the Commission used an incorrect mathematical formula to award temporary partial disability benefits to plaintiff. Therefore, in the interests of justice and pursuant to Appellate Rules 2 and 21, we elect to exercise our discretion in the instant case to treat the record on appeal and briefs as a petition for writ of *certiorari* pursuant to N.C. R. App. P. 21 to review defendants' challenge to the Commission's 5 January 2010 Opinion and Award.

Additionally, we note that defendants failed to articulate grounds for appellate review in their appellate brief. North Carolina Rule of Appellate Procedure 28(b)(4) requires the appellant to set forth a statement of the grounds for appellate review, which "shall include a citation of the statute or statutes permitting appellate review." N.C. R. App. P. 28(b)(4) (2010). Our Supreme Court has held Rule 28(b) to be a nonjurisdictional rule. *Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 362 N.C. 191, 198, 657 S.E.2d 361, 365 (2008). Therefore, we will not dismiss defendants' appeal because "[n]oncompliance with rules of this nature, while perhaps indicative of inartful appellate advocacy, does not ordinarily give rise to the harms associated with review of unpreserved issues or lack of jurisdiction." *Id.* We caution defendants that further noncompliance with the Rules of Appellate Procedure subjects defendants to other penalties, including sanctions. *See Dillingham v. N.C. Dep't of Human Res.*, 132 N.C.

App. 704, 707, 513 S.E.2d 823, 825 (1999) (stating that "the Rules of Appellate Procedure are mandatory and a party's failure to comply with them frustrates the review process and subjects the party to sanctions").

Furthermore, defendants object to only Findings of Fact 25 and 37 in the Commission's 5 January 2010 Opinion and Award. Findings of fact to which plaintiff does not object are binding. *Davis v. Harrah's Cherokee Casino*, 362 N.C. 133, 139, 655 S.E.2d 392, 395 (2008).

## IV. TEMPORARY PARTIAL DISABILITY BENEFITS

**[2]** Defendants argue that the Full Commission erred by incorrectly concluding that plaintiff was entitled to temporary partial disability benefits in the amount of $330.00 per month. We agree.

N.C. Gen. Stat. § 97-30 (2010) states, in pertinent part:

> [W]here the incapacity for work resulting from the injury is partial, the employer shall pay, or cause to be paid, as here-inafter provided, to the injured employee during such disability, a weekly compensation equal to sixty-six and two-thirds percent (66 2/3%) of the difference between his average weekly wages before the injury and the average weekly wages which he is able to earn thereafter, but not more than the amount established annually to be effective October 1 as provided in G.S. 97-29 a week, and in no case shall the period covered by such compensation be greater than 300 weeks from the date of injury.

N.C. Gen. Stat. § 97-30 (2010). Therefore, the mathematical formula articulated in this statute is: $(A—B) \times .6667 = C$, where "A" represents the claimant's average weekly wages before his work-related injury, "B" represents the claimant's average weekly wages which he is able to earn after his work-related injury, and "C" represents the amount of compensation the employer shall pay to the claimant during the period of disability.

Under the Workers' Compensation Act, the diminution of the power or capacity to earn is the measure of compensability. *Branham v. Panel Co.*, 223 N.C. 233, 25 S.E.2d 865 (1943). The disability of an employee due to a work-related injury is to be measured by his capacity or incapacity to earn the wages he was receiving at the time of the injury; loss of earning capacity is the criterion. *Dail v. Kellex Corp.*, 233 N.C. 446, 64 S.E.2d 438 (1951). Compensation must be based upon the loss of wage-earning power rather than the amount actually received by the claimant. *Hill v. DuBose*, 234 N.C. 446, 67

S.E.2d 371 (1951); *see also Evans v. Times Co.*, 246 N.C. 669, 100 S.E.2d 75 (1957).

In the 5 January 2010 Opinion and Award, the parties stipulated that plaintiff's average weekly wages before his work-related injury were $851.03. Therefore, plaintiff had an average annual pre-injury income of $44,253.56 ($851.03 per week x 52 weeks per year = $44,253.56). After plaintiff was injured, he worked as a self-employed used car salesman and earned $11,740.72 at his own used car dealership. McGregor, defendants' vocational rehabilitation specialist, testified that the U.S. national average salary for used car salespeople was $29,931.00, while the average salary for used car salespeople in Rutherfordton was $25,797.00.

In the 5 January 2010 Opinion and Award, the Commission relied more upon McGregor's testimony than plaintiff's in determining plaintiff's post-injury wage-earning capacity. The Commission further found that, by using McGregor's testimony regarding the lower of the two average salaries, plaintiff "suffered a diminution of his wage[-] earning capacity of approximately $18,848 per year." However, in its Conclusions of Law, the Commission concluded that plaintiff "suffered a diminution in his wage[-]earning capacity of approximately $18,438 per year, or $354.57 per week." Since there is a difference of $410.00 in the annual salary the Commission stated in its findings as compared to the annual salary stated in its conclusion, the findings do not support the conclusion.

Moreover, this Court cannot determine the origin of the numbers for the annual salary that the Commission used in its findings or its conclusion regarding plaintiff's diminution in wage-earning capacity. The unchallenged findings in the 5 January 2010 Opinion and Award state that plaintiff's average annual pre-injury income was $44,253.56 ($851.03 per week x 52 weeks per year = $44,253.56). If plaintiff suffered a diminution in his wage-earning capacity of $18,848.00 per year, as the Commission stated in Finding 37, then his post-wage earning capacity would have to be $25,405.56 ($44,253.56 — $18,848.00 ' $25,405.56). If plaintiff suffered a diminution in his wage-earning capacity of $18,438.00 per year, as the Commission stated in Conclusion of Law 8, then his post-wage earning capacity would have to be $25,815.56 ($44,253.56 — $18,438.00 = $25,815.56). However, the Commission's order does not include in its findings or conclusions that plaintiff's post-wage earning capacity was either $25,405.56 or $25,815.56.

Nonetheless, if the Commission correctly applied the mathematical formula in N.C. Gen. Stat. § 97-30 to the first scenario (plaintiff's

post-wage earning capacity of $25,405.56), plaintiff's disability compensation would be: ($851.03-($25,405.56/52 weeks)) x .6667 = $241.65 per week. If the Commission correctly applied the statute to the second scenario (plaintiff's post-wage earning capacity of $25,815.56), plaintiff's disability compensation would be: ($851.03—($25,815.56/52 weeks)) x .6667 = $236.40 per week.

When the Commission determined plaintiff's post-injury earning capacity, it placed greater weight on McGregor's testimony than plaintiff's. Assuming the Commission intended to accept McGregor's testimony that the average yearly salary for used car salespeople in Rutherfordton was $25,797.00, and that the Commission intended to accept this amount as plaintiff's post-injury earning capacity, then plaintiff's weekly wage would be $496.10 ($25,797.00/52 weeks). Therefore, if the Commission correctly applied the statute to this scenario (plaintiff's post-wage earning capacity of $25,797.00), plaintiff's disability compensation would be: ($851.03 — ($25,797/52 weeks)) x .6667 = $236.63 per week.

Assuming the Commission intended to accept McGregor's testimony that the average yearly salary for used car salespeople nationwide was $29,931.00, and that the Commission intended to accept this amount as plaintiff's post-injury earning capacity, then plaintiff's weekly wage would be $575.60 ($29,931.00/52 weeks). Therefore, if the Commission correctly applied the statute to this scenario (plaintiff's post-wage earning capacity of $29,931.00), plaintiff's disability compensation would be: ($851.03 — ($29,931/52 weeks)) x .6667 = $183.63 per week.

However, the Commission determined that plaintiff's temporary partial disability payments would be $330.00 per week for 300 weeks. This amount is incorrect, regardless of which of the above scenarios the Commission decided to use. Since we cannot determine how the Commission mathematically determined the amount of plaintiff's temporary partial disability payments, the Commission's findings regarding this matter are not supported by competent evidence, and the Commission's conclusions are not supported by the findings. Therefore, the Commission erred by denying defendants' motion for reconsideration of the 5 January 2010 Opinion and Award. As a result, we must reverse the Commission's Opinion and Award denying defendants' motion for reconsideration. Furthermore, we vacate the portions of the Commission's 5 January 2010 Opinion and Award regarding this matter and remand it to the Commission for redetermination of plaintiff's temporary partial disability weekly payments.

## V. PAYMENT FOR MEDICAL COMPENSATION

[3] Defendants argue that the Full Commission erred by ordering them to provide medical compensation for plaintiff's treatment by Dr. Hoski. We disagree.

N.C. Gen. Stat. § 97-25 states, in pertinent part:

Medical compensation shall be provided by the employer. In case of a controversy arising between the employer and employee relative to the continuance of medical, surgical, hospital, or other treatment, the Industrial Commission may order such further treatments as may in the discretion of the Commission be necessary.

The Commission may at any time upon the request of an employee order a change of treatment and designate other treatment suggested by the injured employee subject to the approval of the Commission, and in such a case the expense thereof shall be borne by the employer upon the same terms and conditions as hereinbefore provided in this section for medical and surgical treatment and attendance.

. . .

[I]f he so desires, an injured employee may select a physician of his own choosing to attend, prescribe and assume the care and charge of his case, subject to the approval of the Industrial Commission.

N.C. Gen. Stat. § 97-25 (2010). Under this statute, the Commission may order treatment or rehabilitative procedures that it determines, in its discretion, to be reasonably necessary to effect a cure or give relief for an injured employee. *Neal v. Carolina Management*, 130 N.C. App. 228, 502 S.E.2d 424 (1998), *rev'd on other grounds*, 350 N.C. 63, 510 S.E.2d 375 (1999). A claimant is required to obtain the Commission's approval within a reasonable time after he has selected a physician of his own choosing to assume treatment. *Schofield v. Tea Co.*, 299 N.C. 582, 264 S.E.2d 56 (1980), *superseded by statute on other grounds as stated in Franklin v. Broyhill Furniture Industries*, 123 N.C. App. 200, 472 S.E.2d 382 (1996). "[W]hat is reasonable is a question of fact to be determined in the light of the circumstances of each case." *Fontenot v. Ammons Springmoor Assocs.*, 176 N.C. App. 93, 99, 625 S.E.2d 862, 867 (2006).

If the claimant seeks approval within a reasonable time, if the Commission approves the claimant's choice, and if the treatment sought is to effectuate a cure or rehabilitation, then the employer has

a statutory duty under this section to pay for the treatment. *Forrest v. Pitt County Bd. of Education*, 100 N.C. App. 119, 394 S.E.2d 659 (1990). The Commission does not have to preclude payments for a physician's services solely because approval for those services was not previously requested; under this statute, a claimant must only seek approval within a reasonable time not necessarily prior to the services or surgery rendered by the physician. *Id.*

The unambiguous language of N.C. Gen. Stat. § 97-25 leaves the approval of a physician within the discretion of the Commission, and its determination may only be reversed upon a finding of a manifest abuse of discretion. *Franklin v. Broyhill Furniture Industries*, 123 N.C. App. 200, 472 S.E.2d 382 (1996), *rev'd on other grounds, Saums v. Raleigh Community Hospital*, 346 N.C. 760, 487 S.E.2d 746 (1997). The Commission did not abuse its discretion in finding that a four-month delay before the claimant sought authorization for a psychiatrist as a treating physician was reasonable. *Dicamillo v. Arvin Meritor, Inc.*, 183 N.C. App. 357, 644 S.E.2d 647 (2007). In addition, Rule 407(4) of the Workers' Compensation Rules of the North Carolina Industrial Commission ("Rule 407") states, in pertinent part, "The responsible employer or carrier/administrator shall pay the statements of medical compensation providers to whom the employee has been referred by the authorized treating physician, unless said physician has been requested to obtain authorization for referrals or tests . . . ." Workers' Compensation Rules of the North Carolina Industrial Commission, Rule 407(4) (2010).

On 24 January 2006, plaintiff sought a second opinion from Dr. Hoski. On 8 March 2006, less than two months later, plaintiff filed a motion to approve Dr. Hoski as his authorized treating physician. This evidence supports a finding that plaintiff filed his motion within a reasonable time after he selected Dr. Hoski to provide treatment. In addition, less than two months elapsed between the time plaintiff selected Dr. Hoski as his treating physician and the time plaintiff sought approval from the Commission. This is less than the time frame approved of by this Court in *Dicamillo*.

In addition, during Dr. Hunter's deposition, he was asked if it would be appropriate for plaintiff to undergo surgical intervention for treatment of his injury. Dr. Hunter testified, "I think it would be reasonable to proceed with it." Furthermore, after plaintiff sought a second opinion from Dr. Hoski, he returned to Dr. Hunter on 28 February 2006 and told him the results of Dr. Hoski's second opinion. Dr. Hunter indicated that he would "leave it up to the second opinion

physician to care for [plaintiff]." Dr. Hunter testified at his deposition that he "thought it would be worthwhile for [plaintiff] to undergo a second opinion." Therefore, this evidence shows that plaintiff complied with Rule 407.

Moreover, plaintiff completed all of the conservative treatment ordered by Dr. Hunter, including physical therapy, chiropractic treatment, medication, exercises, cortisone injections, epidural injections, and a CT myelogram. On 24 January 2006, Dr. Hoski reviewed the CT myelogram and noted that it demonstrated degenerative disc disease at L1-2 and right central disc protrusion at L-5/S-1. After performing a comprehensive examination, Dr. Hoski noted that plaintiff was a candidate for L-5/S-1 micro lumbar discectomy. Dr. Hoski noted that the goals of this surgery were to reduce plaintiff's leg pain and increase his level of function.

Dr. Hoski performed surgery on plaintiff on 30 March 2006. He then referred plaintiff for physical therapy for the period from 23 May through 30 August 2006. While plaintiff continued to experience lower back pain, the surgery decreased his leg pain. Dr. Hoski testified at his deposition that his services were useful in lessening plaintiff's impairment.

This evidence supports the Commission's finding that Dr. Hoski's treatment was beneficial in reducing plaintiff's pain levels and lessening his impairment. This finding supports the Commission's conclusion that Dr. Hoski's treatment "was appropriate and reasonably necessary" to provide pain relief and improve plaintiff's function. Therefore, the Commission did not abuse its discretion by granting plaintiff's request to approve Dr. Hoski as his authorized treating physician, and by ordering defendants to pay plaintiff's medical expenses incurred as a result of Dr. Hoski's treatment. This issue on appeal is overruled.

## VI. CONCLUSION

The Commission's Opinion and Award denying defendants' motion for reconsideration is reversed. The portions of the Commission's 5 January 2010 Opinion and Award regarding the amount of plaintiff's temporary partial disability payments are vacated and remanded to the Commission for redetermination. The remaining portions of the Commission's 5 January 2010 Opinion and Award are affirmed.

Reversed in part, vacated and remanded in part, affirmed in part.

Judges ELMORE and STEELMAN concur.